**Slip Op. 04-104**

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| ———————————————— : | |
| MATTEL, INC. and FISHER PRICE, INC. : | |
| : | |
| *Plaintiffs,* : | |
| : | |
| v. : | Court No. 98-12-03231 |
| : | |
| UNITED STATES, : | |
| : | |
| *Defendant.* : | |
| ———————————————— : | |

[Plaintiffs' motion for summary judgment granted; Defendant's cross-motion for summary judgment denied, and action dismissed.]

Decided: August 19, 2004

Stein Shostak Shostak & O'Hara, P.C. (Marjorie M. Shostak and Heather C. Litman), for Plaintiffs.

Peter D. Keisler, Assistant Attorney General; John J. Mahon, Acting Attorney in Charge, International Trade Field Office, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (Mikki Graves Walser); Sheryl A. French, Office of the Assistant Chief Counsel, International Trade Litigation, U.S. Customs Service, Of Counsel; for Defendant United States.

**OPINION**

RIDGWAY, Judge:

In this action, plaintiffs Mattel, Inc. and its wholly-owned division, Fisher-Price, Inc.,

(collectively "Mattel") challenge the decision of the U.S. Customs Service ("Customs")[1] denying

---

[1]Effective March 1, 2003, the United States Customs Service was renamed the Bureau of Customs and Border Protection of the United States Department of Homeland Security. See Reorganization Plan Modification for the Department of Homeland Security, H.R. Doc. 108-32 at 4 (2003).

Mattel's protests concerning the tariff classification of certain children's merchandise imported by Mattel and marketed in this country as "Pop-Up Wackaroos."[2]

The Government maintains that Customs properly classified the "Pop-Up Wackaroos" as toys – specifically, "[o]ther toys . . . [i]ncorporating an electric motor," under subheading 9503.80.20 of the Harmonized Tariff Schedule of the United States ("HTSUS") (1994),[3] assessing duties at the rate of 6.8 % *ad valorem*. *See generally* Memorandum in Support of Defendant's Opposition to Plaintiffs' Motion for Summary Judgment and in Support of Defendant's Cross-Motion for Summary Judgment ("Def.'s Brief"); Defendant's Reply to 'Plaintiff's Combined Opposition to Defendant's Cross-Motion for Summary Judgment and Reply to Defendant's Opposition to Plaintiffs' Motion for Summary Judgment' ("Def.'s Reply Brief").

Mattel contends that Pop-Up Wackaroos are instead properly classifiable as "[g]ame machine[s]," under subheading 9504.90.40, and thus are dutiable at the significantly lower rate of 3.9 %. *See generally* Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Summary Judgment ("Pls.' Brief"); Plaintiffs' Combined Opposition to Defendant's Cross-Motion

---

[2]Two Customs rulings on Pop-Up Wackaroos are included in the record. Customs Headquarters Decision on Further Review of Protest (March 7, 1996) ("Customs Headquarters Decision Memo") appears in the record as Plaintiffs' Exhibit 11 and as Defendant's Attachment A. The agency's ruling on Mattel's protest – HQ 958869 (May 13, 1998) ("Customs' Ruling Letter") – appears in the record as Plaintiffs' Exhibit 2 and as Defendant's Exhibit A.

[3]All references are to the 1994 version of the HTSUS.

for Summary Judgment and Reply to Defendant's Opposition to Plaintiffs' Motion for Summary

Judgment ("Pls.' Reply Brief").[4]

Cross-motions for summary judgment are pending.  Jurisdiction lies under 28 U.S.C. §

1581(a) (1994).  Customs' classification decisions are subject to *de novo* review pursuant to 28

U.S.C. § 2640 (1994).  For the reasons discussed below, "Pop-Up Wackaroos" are properly

classified as "[g]ame machines" under subheading 9504.90.40 of the HTSUS.

Mattel's  motion for summary judgment is therefore granted, and the Government's cross-

motion is denied.


## I.  Background

The box in which it is sold describes the merchandise here at issue – "Pop-Up Wackaroos"

– as "[a] fast-paced preschool game" designed for children "[a]ges 3-7."  *See* Def.'s. Exh. C (sample

of merchandise at issue).[5]  In essence, it is a scaled-down, children's version of "Whac-A-Mole," a

venerable and beloved game common in arcades and casinos throughout the country.

---

[4]Heading 9503 covers, in relevant part, "[o]ther toys; reduced-size ("scale") models and similar recreational models, working or not; puzzles of all kinds; parts and accessories thereof." Subheading 9503.80.20 covers "[o]ther toys and models incorporating a motor and parts and accessories thereof; Toys (except models): Incorporating an electronic motor."

Heading 9504 covers, in relevant part, "articles for funfair, table or parlour games, including pintables, billiards, special tables for casino games and automatic bowling alley equipment." Subheading 9504.90.40 covers "[o]ther: Game machines, other than coin–or token-operated; parts and accessories thereof."

[5]Except as otherwise expressly indicated, the facts in this section are drawn largely from an examination of the sample merchandise.  *See* Def.'s Exh. C (sample merchandise).

Pop-Up Wackaroos consists of two pieces – a small, somewhat irregularly-shaped base unit made of hard plastic, and a two-headed, accordion-style mallet made of soft plastic. When the base unit is turned on, a timing device is activated, whooping, "wacky arcade sounds" begin to play, and six small comical "critter heads" randomly pop up – one at a time – out of six holes (or cavities) in the base unit, before quickly disappearing back into their respective holes.[6]

For young children playing Pop-Up Wackaroos, the object is to "beat the clock" by using the mallet to quickly strike each critter as it pokes its head up (before it disappears back into its hole) – and to successfully hit all six critters before time runs out and the unit automatically shuts off (after roughly one minute or so).[7]

If a child succeeds in hitting a critter head while it is poking out of its hole, that critter makes a warbling, chirp-y sound, then does not pop up again. Any remaining critter heads (*i.e.*, critter heads that have not been successfully struck while out of their holes) continue to randomly pop up

---

[6]To start "Pop-Up Wackaroos," a child pushes the large red button in the lower left hand corner of the base unit. A battery-powered motor then causes the six "critter heads" – one at a time – to randomly pop out of, and quickly disappear back into, their respective holes.

As parents are warned in the sheet of "Instructions" included with the merchandise, "There is no 'OFF' switch on this product." *See* Def.'s Exh. C (sample merchandise). *Compare* Customs' Ruling Letter (stating, incorrectly, that the red button on the merchandise is both an "on" and an "off" switch).

[7]As explained in the Instructions packaged with the merchandise, "[t]he Pop/Up Wackaroos game will automatically shut off after approximately one minute. 'Winning' the game will also automatically shut off the game." *See* Def.'s Exh. C (sample merchandise). The sample merchandise provided as Defendant's Exhibit C runs for approximately one minute and forty-five seconds before automatically shutting off (unless a player successfully hits all six critter heads, in which case it shuts off sooner).

– one at a time – and then disappear again, until "time is up" (or until all six heads have been successfully struck, whichever happens first).[8]  According to the back of the product box:

> Kids love keeping these cute critters from popping up.  Turn it on, watch as they come out of their holes, then try to bop them back into place.  Players win when all the critters stay down.

*See* Def.'s Exh. C (sample merchandise).

If a child hits all six critter heads within the allotted time (*i.e.*, before the unit automatically shuts off), the child "wins," and a distinctive, melodic "cavalry-charge"-type fanfare plays, heralding the child's success.  On the other hand, if time expires before the child succeeds in striking all six "critter heads" while they are poking out of their holes, the unit silently shuts off.  *See* Def.'s Exh. C (sample merchandise).

## II.  <u>Standard of Review</u>

Under USCIT Rule 56, summary judgment is appropriate where "there is no genuine issue as to any material fact and . . . the moving party is entitled to . . . judgment as a matter of law." USCIT R. 56(c).

Customs classification decisions are reviewed through a two-step analysis – first, construing the relevant tariff headings, a question of law; and second, determining under which of those headings the merchandise at issue is properly classified, a question of fact.  <u>Bausch & Lomb, Inc.</u>

---

[8]A hit is successful only if the critter is struck while it is poking out of its hole; and the critters randomly pop out of their holes.  However, there is otherwise no particular "order" in which the critters must be struck.  *Compare* Customs' Ruling Letter (stating – in error – that "[i]f a child hits all the 'heads' with the mallet *in the correct order* . . . the unit makes bells and buzzer sounds" (emphasis added)).

v. United States, 148 F.3d 1363, 1365 (Fed. Cir. 1998) (*citing* Universal Elecs., Inc. v. United States, 112 F.3d 488, 491 (Fed. Cir. 1997)).

Summary judgment is thus appropriate where, as here "there is no genuine dispute as to the underlying factual issue of what exactly the merchandise is." *Id.* at 1365.  A factual dispute is genuine only "if the evidence is such that the [the trier of fact] could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  "[T]here is no issue for trial unless there is *sufficient evidence* favoring the nonmoving party . . . .  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (emphasis added) (citations omitted).  Thus, at the summary judgment stage, the question to be answered is "whether there is the need for a trial – whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250.

On review, Customs' classification rulings are accorded a measure of deference proportional to their power to persuade, in accordance with the principles set forth in Skidmore v. Swift & Co., 323 U.S. 134 (1944). *See* United States v. Mead Corp., 533 U.S. 218, 234-35 (2001); Mead Corp. v. United States, 283 F.3d 1342, 1346 (Fed. Cir. 2002).

### III. <u>Analysis</u>

The classification of all merchandise is governed by the General Rules of Interpretation ("GRIs"), which provide a framework for classification under the HTSUS, and are to be applied in sequential order. *See*, *e.g.*, North Am. Processing Co. v. United States, 236 F.3d 695, 698 (Fed. Cir. 2001); Orlando Food Corp. v. United States, 140 F.3d 1437, 1439 (Fed. Cir. 1998).

The GRIs relevant to this action are GRIs 1 and 3.  Most goods are classified pursuant to GRI 1, which provides that "classification shall be determined according to the terms of the headings and any relevant section or chapter notes and, provided such section or notes do not otherwise require, according to [GRIs 2 through 6]."  GRI 2(a) and 2(b) – which have no bearing here – generally deal, respectively, with the classification of articles that are "incomplete," "unfinished," "unassembled," or "disassembled," and with the classification of "mixtures or combinations" of materials or substances).  GRI 3, in turn, governs the tariff treatment of goods that "are, *prima facie*, classifiable under two or more headings."

Both Mattel and the Government contend that Pop-Up Wackaroos is classifiable pursuant to GRI 1 – albeit with very different results.  Mattel asserts that GRI 1 leads to classification as a "game machine" under heading 9504, while the Government maintains that it leads to classification as a "toy" under heading 9503.  *See*, *e.g.*, Pls.' Brief at 6; Def.'s Brief at 22.  Mattel argues, in the alternative, that – even if Pop-Up Wackaroos is *prima facie* classifiable under both headings 9503 and 9504 – GRI 3 compels classification as a "game machine."  *See*, *e.g.*, Pls.' Brief at 4, 11-13; Pls.' Reply Brief at 10-11.

The parties' arguments are considered in turn below.

### A.  GRI 1: The Terms of The Headings

Classification under GRI 1 begins with "the terms of the headings and any relevant section or chapter notes."  GRI 1.

1.  <u>Heading 9504: The Definition of "Game"</u>

The Government explains that, because the term as used in heading 9504 is not defined in the HTSUS, Customs has established criteria for determining whether an article is classifiable as a "game," "[b]ased upon the dictionary definition of the term . . . and the prior judicial construction of that term."  Def.'s Brief at 13.  According to the Government, to secure tariff treatment as a "game," an article must involve:

> (1) a competition or contest with the objective of winning;
> (2) play activity between two or more people or between one person and the game itself;
> (3) skill, chance, or endurance, or a combination of these elements; and
> (4) a method or system of scoring.

Def.'s Brief at 13; Def.'s Reply Brief at 5, 10.  *See also* Customs Headquarters Decision Memo at 2.

The Government maintains that Customs correctly found that Pop-Up Wackaroos "does not satisfy criteria (1), (3), and (4)" – that is, that the merchandise does not involve "a competition or contest with the objective of winning"; that it does not involve "skill, chance, or endurance, or a combination of these elements"; and that it does not involve "a method or system of scoring."[9] Def.'s Brief at 14.  Thus, according to the Government, Customs properly concluded that Pop-Up Wackaroos cannot be classified as a "game" under heading 9504.

---

[9]Interestingly, the Government at one point appears to retreat from its claims as to two of the three criteria.  In its Reply Brief, the Government asserts that Pop-Up Wackaroos is not classifiable as a "game" because it "does not involve a physical or mental competition" (criterion (1) ).  But it makes no reference whatsoever to "skill, chance, or endurance" or "a method or system of scoring" (criteria (3) and (4) ).  *See* Def.'s Reply Brief at 1.

To the contrary, as discussed more fully below, nothing in the relevant case law requires a "game" to have "a method or system of scoring" (at least not in the sense that Customs and the Government here use that concept). Nor do dictionary definitions reflect any such requirement. Moreover, such a requirement is belied by everyday logic and common sense, as well as Customs' past practice. In short, there is no basis for criterion (4) above – at least not in the sense in which Customs applied it in this instance.

In addition, contrary to the Government's assertions, Pop-Up Wackaroos both involves "a competition or contest with the objective of winning" (criterion (1)), and requires "skill, chance, or endurance, or a combination of these elements" on the part of players (criterion (3)). The Government's objections to classification under heading 9504 thus have no merit.

a. "A Method or System of Scoring"

The Government represents that controlling judicial precedent on the definition of a "game" requires a system of scoring.[10] *See* Def.'s Brief at 6 (asserting that Mego defined "games" as including "a method or system of scoring"), 13 (stating that, "according to the CCPA, an activity is a 'game' if it results in a 'score'"), 15-16 (suggesting that Montgomery Ward requires a scoring system). In fact, the Government simply misreads both Mego and Montgomery Ward (which Mego cites). *See generally* Mego Corp. v. United States, 62 CCPA 14, 505 F.2d 1288 (1971) (Mego); Montgomery Ward & Co. v. United States, 66 Cust. Ct. 233, 238 (1971) (Montgomery Ward).

---

[10]Both Mattel and the Government agree that Mego is the controlling authority on the definition of "game." *See* Pls.' Brief at 6; Def.'s Brief at 11-12.

While both Mego and Montgomery Ward stand for the proposition that an element of "contest" must be present, neither case expressly or implicitly requires a "system of scoring" as an essential element of a "game." Rather, in both cases, the existence of a system of scoring was treated as *evidence* that the play activity at issue constituted a "contest."

Mego involved the classification of a miniature pinball machine under the Tariff Schedule of the United States ("TSUS"), the predecessor to the HTSUS. There, as here, the key question was whether the merchandise at issue was a "game." The Mego court endorsed the parties' reliance on the common meaning of "game," as reflected in dictionary definitions of the term. Thus, Mego held that a game "must be competitive or involve a contest, and must possess an element of skill, chance, or endurance." Mego, 62 CCPA at 18. Conspicuously absent from that definition is any reference to a "system of scoring." Indeed, the Mego court referred to "the objective . . . [of] get[ting] the balls into the highest numbered slots *to make the highest score*" – its sole reference to a "system of scoring" – only to establish the presence of "the element of contest," which *is* required of a "game." Mego, 62 CCPA at 18 (emphasis added).

As support for its holding that the objective of reaching a higher score satisfies the element of "contest" required for classification as a "game," the Mego court quoted Montgomery Ward. Like Mego and the case here at bar, Montgomery Ward concerned whether certain merchandise – there, the "Mechanical Mother Hen Target Game" – was a "game" (or a "game machine") for tariff purposes.

Significantly, the legal issue presented in Montgomery Ward (and, in particular, the subject of the excerpt quoted in Mego) was *not* whether "scoring" is a required element of a "game," but –

rather – whether the mandatory element of a "contest" necessarily required competition *between at least two people.* 66 Cust. Ct. at 239. Montgomery Ward held that the "contest" required for classification as a game "may be between two or more persons, or between one person and the game itself," citing pinball machines, slot machines, and darts as "games" that may be played by one person alone. *Id.* The court reasoned:

> The point is that these activities [*i.e.*, pinball, slot machines, and darts] are games since they result in a '*score*' measuring one's skill or luck or combination thereof against a given set of rules.

*Id.* (emphasis added).

The court's point in Mongtomery Ward was that – because they result in a "score" – pinball, slot machines, and darts satisfy the required element of a "contest," even when they do not involve two or more competitors. The court notably did not hold that, in addition to involving a "contest," a game must *also* involve "scoring."

In sum, read carefully and in context, it is clear that – in both Montgomery Ward and Mego – the court viewed "scoring" *not* as an independent element required for classification as a "game," but, rather, as an indicator (or as evidence) of the existence of the required element of a "contest." The controlling case law simply does not require that a game, for tariff classification purposes, involve "scoring."

Nor do dictionaries define "game" to require "a method or system of scoring." Certainly the dictionary definitions of the term in Mego and Montgomery Ward did not mention scoring. *See* Mego, 62 CCPA at 18 (noting that the parties there "cite various dictionary definitions which indicate that a 'game' must be competitive or involve a contest, and must possess an element of skill,

chance, or endurance"); Montgomery Ward, 66 Cust. Ct. at 236 (quoting at least seven definitions

of "game" from three different dictionaries).

Moreover, none of the dictionary definitions cited by the Government in the case at bar

identify "scoring" as an essential element of a "game."  Indeed, of the three different dictionaries and

the *nine or more definitions* of the term quoted in the Government's briefs, *only one* of those

definitions even mentions a variant of the word "score."  *See* Def.'s Brief at 11 (quoting Webster's

Third New International Dictionary (Unabridged 1961), Webster's New World Dictionary (Third

College Edition 1988), and Merriam Webster's Collegiate Dictionary (Tenth Edition 1996); Def.'s

Reply Brief at 3 (reiterating the same quotes).  And that reference actually does not use "scoring"

in the sense in which the Government is using the term here; rather, it comes from a definition of the

word "game" meaning – literally – "[t]hat which is gained as the result a game."[11]

The definitions of "game" in Mego and Montgomery Ward, as well as various dictionaries

– none of which require a "system of scoring" – are also consistent with everyday logic and common

sense.  Examples of "games" lacking "scoring" (*i.e.*, a graduated system of measuring performance)

abound.[12]  The company picnic favorite, "tug-of-war," in which two groups of people on either end

---

[11]The Government's use of ellipses is misleading.  As quoted in the Government's briefs, it appears that the phrase "The number of points necessary to be scored in order to win . . ." is part and parcel of the definition numbered "3 a (1)": "a physical or mental competition conducted according to rules in which the participants play in direct opposition to each other, each side striving to win and to keep the other side from doing so."  But, in truth, the reference to "scored" is actually part of another distinct, separately numbered definition, concerning a different, and arguably irrelevant, meaning of "game."

[12]It is worth noting that the concept of "scoring" does not necessarily inherently connote a graduated, multi-level or numerical measuring system (as Customs and the Government apparently contend).  Thus, it is not apparent why a binary "win/lose" system cannot constitute a system of

of a rope try to pull each other across a dividing line, involves only a binary construct – "winning and losing" – without any graduated method of measuring the performance of the winners and losers.[13] The perennial barroom classic, "arm wrestling," similarly lacks any inherent method of distinguishing one winner or loser from another.

Further, this observation is not limited to games involving physical contests. The electronic game "Simon," emblematic of the late 1970s, consisted of a round plastic disc with four, large different colored buttons. Players tried to memorize and then repeat increasingly long sequences of musical tones after they were emitted from the disc and displayed by the illumination of the different colored buttons. Notably, Simon did not include any method of measuring a player's performance or "score." Nevertheless, Customs clearly considered it to be a "game" for tariff purposes. In a

---

scoring. Indeed, Montgomery Ward defined "score" simply as the "measuring [of] one's skill or luck or combination thereof against a given set of rules." Montgomery Ward, 66 Cust. Ct. at 238. A "measuring" system based on 0 and 1 is not qualitatively different from a measuring system based on 0, 1, 2, and 3; it is merely more crude.

It is, in any event, unclear precisely what Customs means by a "system of scoring." While the agency sometimes appears to require a scoring method capable of measuring gradations of performance (i.e., beyond simply determining winning or losing) (see, e.g., Aff. of Customs National Import Specialist ¶ 36 (asserting that Pop-Up-Wackaroos lacks a "timing or scoring mechanism [that would permit players to] know if they were improving")), Customs has – in a number of instances – classified as "games" articles that did not provide for a system of scoring beyond a method of determining a winner and loser. See, e.g., HQ 801795 (Dec. 21, 1991), HQ 037583 (Feb. 13, 1975) (electric racing car sets without lap timers or lap counters classified as games); HQ 038561 (Mar. 3, 1975) (mechanical karate action figures providing only for win/lose competition classified as games); HQ 959558 (Sept. 14, 1998) (box of chewing gum with plastic maze dispenser, and win/lose objective, classified as a game).

[13]Obviously, a graduated method of scoring may be imposed in any "win/lose" game by, for example, playing for "two-out-of-three." The point, however, is that graduated scoring is not intrinsic to the game itself.

ruling made under the TSUS, Customs classified a part used in the manufacture of "Pocket Simon"

(a miniaturized version of Simon) under the tariff provision for "game machines and parts thereof."

*See* HQ 800291 (Apr. 7, 1981). Thus, even Customs' own prior practice demonstrates that tariff

classification as a game does not turn on the presence of a "system of scoring" (at least not in the

sense in which the Government uses that term here).[14]

---

[14]There are other similar examples of prior Customs practice that cannot be reconciled with the agency's position on "scoring" here. In fact, on other occasions, Customs has classified items lacking graduated systems of scoring as "games" under heading 9504 – the very HTSUS provision here at issue.

For example, "Wolverine Maze Candy" was a small box filled with pieces of chewing gum, with a plastic maze/dispensing portal on the top. In order to extract a piece of gum, one had to navigate the gum through the maze to the opening. Classifying the item as a game, Customs described it as a "contest or competition against oneself with a win/loose [sic] objective." HQ 959558 (Sept. 14, 1998). The chewing gum dispenser clearly did not have any system of measuring a player's performance (indeed, query whether one could even lose the "game"); yet Customs found that the chewing gum dispenser satisfied the same four specific criteria that the Government and Customs relied on here. *See also* n.12, *supra* (listing other such examples).

Customs' handling of "scoring" vis-a-vis classification as a "game" has been inconsistent in other ways as well. For example, some Customs rulings concerning potential classification as a "game" list scoring as an essential criterion, while others do not. *Compare* HQ 076287 (July 31, 1985), HQ 05279 (Feb. 13, 1978), *with* HQ 0375853 (Feb. 13, 1975), HQ 038561 (Mar. 3, 1975), HQ 033067 (Aug. 18, 1976), HQ 800741(June 26, 1981), HQ 061105 (Aug. 10, 1979), HQ 057781(Apr. 1, 1978), HQ 049067 (Apr. 21, 1977), HQ 087976 (Dec. 13, 1990).

And even where Customs' analysis points to scoring, sometimes it is treated not as an independent criterion for classification as a "game," but rather as evidence of the existence (or lack thereof) of a "contest" or "competition." *See, e.g.*, HQ 033067 (Aug. 18, 1976) (method of computing scores cited among "factors . . . sufficient . . . to conclude [that the article] was designed and constructed to be used in competition"); HQ 061015 (Aug. 10, 1979) (finding that the object of the game in question is to score the highest number of points and therefore "is designed for use as a competition"); HQ 052868 (Aug. 19, 1977) (system of scoring listed among factors supporting conclusion that "competitiveness . . . is clearly lacking").

In sum, Customs has identified no basis in law or logic for requiring "a method or system of scoring" as an integral element for tariff classification as a "game."  Accordingly, its determination that Pop-Up Wackaroos lacks such a system gives no pause.

### b.  "A Competition or Contest with the Objective of Winning"

The Government further contends that Customs properly determined that Pop-Up Wackaroos does not involve "a competition or contest with the objective of winning" – criterion (1) of Customs' standard formulation for a "game."  *See generally* Def.'s Brief at 16-17; Def.'s Reply Brief at 11-12.  However, an examination of the sample merchandise refutes Customs' determination.  *See* Def.'s Exh. C (sample merchandise).

 Pop-Up Wackaroos plainly constitutes "a competition or contest" between the child playing with the merchandise and the item itself.  The objective of play is for the child to "beat" the merchandise by successfully striking all six critter heads *at the appropriate time* (*i.e.*, as each individual head randomly pops up, but before it quickly disappears back into its hole) and *within the allotted time* (*i.e.*, before the timing device automatically shuts off the merchandise, silencing the background arcade sounds that always accompany play, and forcing the child to cease play without enjoying the distinctive, melodic fanfare that heralds a "win").  In short, Pop-Up Wackaroos

---

In fact, Customs has explicitly stated that, for some merchandise, a system of scoring is among a list of elements or features *not all of which need be present* in order to satisfy the criteria for classification as a "game."  *See, e.g.*, HQ 087976 (Dec. 13, 1990) (listing lap counters, lap timers, and finish lines among elements providing evidence of competition in race car sets, but emphasizing that not all elements are required).

effectively pits the child who is playing with the merchandise in a "race against time."[15]  *See generally* Pls.' Brief at 9; Pls.' Reply Brief at 8-9.

The Government attempts to dismiss the timing device in Pop-Up Wackaroos as a mere "battery-saving feature." Def.'s Brief at 17.  But that argument is unavailing.  As an initial matter, the Government proffers no evidence (affidavit testimony or otherwise) in support of its claim, which appears only in its legal briefs.[16]   In contrast, the uncontested testimony of a Fisher-Price game designer confirms that the "timing element" of Pop-Up Wackaroos creates "a *challenge* by the machine against the player."  Pls.' Exh. 5 ("Aff. of Fisher-Price Designer") ¶ 12 (emphasis added).

More fundamentally, it completely strains credulity to claim that a timing device that shuts off a product *after only one minute* is simply an energy-saving feature – particularly where, as here, the timing device shuts off the product after just a minute or so *without regard to whether or not the product is still in active use.*  The timing element here thus is no mere "battery-saving device."

---

[15]The Government asserts that "a child between the ages 3-7 is not capable of measuring time to 'play against' the machine." *See* Defendant's Response to Plaintiffs' Statement of Material Facts ¶ 8.  However, the Government fails to back up that statement with any affidavit testimony or other evidence to substantiate its claim.  Such bald allegations do not suffice to create a genuine issue of material fact on a motion for summary judgment. *See*, *e.g.*, Sweats Fashions Inc. v. Pannill Knitting Co., 833 F.2d 1560, 1562 (Fed. Cir. 1987) (in opposing a motion for summary judgment, a non-movant may not rest upon mere denials, "but must proffer countering evidence sufficient to create a genuine factual dispute.")

[16]Again, as noted above, unsupported allegations generally do not suffice to create a genuine issue of material fact on a motion for summary judgment. *See*, *e.g.*, Sweats Fashions Inc., 833 F.2d at 1562 (in opposing summary judgment, a non-movant may not rest upon mere denials, "but must proffer countering evidence sufficient to create a genuine factual dispute.")

Rather, it serves to inject the element of "competition or contest" into Pop-Up Wackaroos.[17] Indeed, even the Government's expert – a National Import Specialist – implicitly recognizes that the time pressure inherent in Pop-Up Wackaroos effectively "challenges" players, attesting that a player conceivably might "get good at [playing], and always beat the one-minute." Def.'s Exh. B ("Aff. of Customs National Import Specialist") ¶ 22.)

Just as an examination of the sample merchandise at issue establishes that Pop-Up Wackaroos involves the requisite element of "competition or contest," so too such an examination establishes the presence of "the objective of winning" that is mandatory for tariff classification as a "game." As explained above, the objective of playing with Pop-Up Wackaroos is to "beat" the product by striking all six critter heads *at the appropriate time* (*i.e.*, as each individual head randomly pops up, but before it quickly disappears back into its hole) and *within the allotted time* (*i.e.*, before the timing device automatically shuts off the merchandise, silencing the background "wacky arcade sounds" that always accompany play, and forcing the child to cease play without enjoying the distinctive, melodic fanfare that plays to trumpet success). Thus, a player "wins" at Pop-Up Wackaroos by successfully striking (1) all six critter heads, (2) at the appropriate time, and (3) within the allotted time.

---

[17]It is also telling that the timing element is emphasized in the retail packaging of Pop-Up Wackaroos. Specifically, five of the six sides of the box in which the merchandise is sold tout it as "A *fast-paced* preschool game!" *See* Def. Exh. C (sample merchandise) (emphasis added). While it is true that the manner in which an article is merchandised is not solely determinative of its classification, it is also true that the importer's consistent description of the merchandise as a "game" is a relevant factor. *See, e.g.*, R. Dakin & Co. v. United States, 14 CIT 797, 800-01 (1990) (citing cases).

The Government inexplicably asserts that "[t]here is no indication of winning or losing in playing with Pop-Up Wackaroos; there is no indication that the Pop-Up Wackaroos has won and the child has lost or vice versa." Def.'s Brief at 16-17. *See also* Def.'s Reply Brief at 8 ("Pop-Up Wackaroos has no method of determining whether the child has won or, conversely, that the machine has won"). The Government further states that "[a] child merely continues playing until bells and buzzers sound." Def.'s Reply Brief at 8. The facts are quite to the contrary.

If a player "wins" by successfully striking all six critter heads at the appropriate time and within the allotted time, that "win" is announced by a distinctive, melodic fanfare. Similarly, if Pop-Up Wackaroos "wins" (*i.e.*, if a player "loses" by failing to strike all six critter heads at the appropriate time and before the allotted time expires), the distinctive fanfare *does not* play. Instead, the automatic timing device simply shuts off the merchandise, silencing the background arcade sounds that always accompany play, and forcing the child to cease play without enjoying the melodic fanfare associated with victory.

In short, contrary to the Government's claims, after a maximum of approximately one minute of play with Pop-Up Wackaroos, a "winner" is declared – and either the distinctive, triumphant fanfare plays, or it does not. If the fanfare of victory is heard, the player has won; if it is not heard, the player has lost. In any event, it is difficult to imagine – in the Government's phraseology – a simpler or clearer "indication that the Pop-Up Wackaroos has won and the child has lost or vice versa."[18] Moreover, there is no truth whatsoever to the Government's claim that "[a] child merely

---

[18]The objective of "winning" is reinforced by the retail packaging of Pop-Up Wackaroos, as well as the Instructions included with the merchandise. For example, the back of the box in which the merchandise is sold states: "Players *win* when all the critters stay down." *See* Def.'s Exh. C

continues playing until bells and buzzers sound."  Def.'s Reply Brief at 8.  The "bells and buzzers"
to which the Government refers are actually instead the distinctive, melodic fanfare of victory; and
it sounds *only* if the child "wins" as described above.  Otherwise, Pop-Up Wackaroos automatically
shuts itself off after approximately one minute.  Contrary to the Government's assertions, it simply
is not possible for a child to continue playing indefinitely "until bells and buzzers sound."  The very
design of the product precludes it.

Also wide of the mark is the Government's claim that the distinctive fanfare of victory
indicates nothing more than the fact "that no more heads will pop-up to be hit, *i.e.*, the task
(pounding down all heads) is complete, and the play activity has ended."  *See* Def.'s Brief at 16.
Critter heads stop popping up and the play activity ends after a maximum of approximately one
minute in any event, whether a player "wins" or not.  But the victorious fanfare is heard only if the
critter heads stop popping up because a player has "won."  The fanfare thus signifies more than
simply the *fact* that no more heads will pop up; they also signify the *reason* that no more heads will
pop up – *i.e.*, it signifies that the player has "won" by successfully striking all six critter heads at the
appropriate time, and before the allotted time expired.[19]

_____

(sample merchandise) (emphasis added).  Similarly, the Instructions state: "Players *win* when all the
critters have been pounded to stay down" and "'*Winning*' *the game* will . . . automatically shut off
the game." *See* Def.'s Exh. C (sample merchandise) (emphasis added).  Although an importer's own
representations as to its merchandise are not determinative, they are a factor to be considered for
classification purposes. *See*, *e.g.*,  R. Dakin & Co. v. United States, 14 CIT 797, 800-01 (1990)
(citing cases).

[19]The Government further asserts that the sounds of the distinctive, melodic fanfare of victory
"at most, represent a reward" for pounding down all of the heads within the allotted time.  Def.'s
Brief at 16.  Particularly in this context, however, it is difficult to discern  how a "reward" is
inconsistent with the notion of "winning" a game.  Indeed, in classifying the "Wolverine Maze

In short, the Government's arguments on this point fail to carry the day. Pop-Up Wackaroos plainly involves "a competition or contest with the objective of winning," and thus satisfies criterion (1) for tariff classification as a "game."

### c. "Skill, Chance, or Endurance"

As with criteria (1) and (4), discussed above, the Government also seeks to defend Customs' determination that Pop-Up Wackaroos does not satisfy criterion (3) – *i.e.*, that it does not involve "skill, chance, or endurance, or a combination of these elements." But, apart from a handful of bald assertions that it is not met, the Government's papers have little to say about the criterion. *See* Def.'s Brief at 13 (asserting that "Pop-Up Wackaroos . . . does not . . . measur[e] one's skill or luck or combination thereof"), 14 (alleging that "Pop-Up Wackaroos does not . . . measur[e] one's skill or luck, or skill and luck").

It is, in any event, beyond cavil that skill (and/or luck) is involved in Pop-Up Wackaroos. Although the Government contends that there is no requirement "that the player must hit all of the [pop-up critter] heads within any specific time frame" and that "there is no real method of measuring one's skill or luck" in playing with Pop-Up Wackaroos (*see* Def.'s Reply Brief at 7), those statements simply cannot be squared with the facts.

As discussed elsewhere, an examination of the sample merchandise reveals that, to "win" at Pop-Up Wackaroos (and thus to trigger the playing of the distinctive, melodic fanfare of victory),

---

Candy" game, it was precisely a reward (there, chewing gum) for successfully completing a task (there, navigating a maze) that Customs considered sufficient to satisfy "game" criterion (2) – "a competition or contest with the objective of winning." *See* n.14, *supra*.

a child must strike all six critter heads *at the appropriate time* (*i.e.*, as each individual head randomly pops up, but before it quickly disappears back into its hole) and *before the allotted time expires* (*i.e.*, before the timing device automatically shuts off the merchandise, after roughly one minute of play). *See* Def.'s Exh. C (sample merchandise). Thus, contrary to the Government's claims, "winning" at Pop-Up Wackaroos is expressly defined in terms of successfully striking all six heads within a "specific time frame." Similarly, a player's "skill or luck" is measured in terms of time – whether the player successfully strikes all six critter heads *at the appropriate time* and *within the allotted time expires*.

Indeed, in speculating that a child conceivably "might get good at [Pop-Up Wackaroos], and always *beat* the one-minute," the Government's own expert – the National Import Specialist – implicitly admits that the timing element of Pop-Up Wackaroos increases the challenge inherent in trying to strike critter heads in motion, necessarily requiring a certain degree of skill on the part of a player. *See* Aff. of Customs National Import Specialist ¶ 22 (emphasis added).[20] The point here

---

[20]The Government's papers include other similar concessions as well. For instance, the Government seeks (albeit in a slightly different context) to analogize Pop-Up Wackaroos to another Fisher-Price product, the "Tap 'n Turn Bench" – which the Government characterizes as a "classic work bench pegs and hammer toy." *See* Def.'s Brief at 27. But the Government's attempted analogy fails for a variety of reasons, some of which are relevant here.

Thus – for purposes of this discussion of "*Skill*, Chance, or Endurance" – it is sufficiently telling that the Government concedes that the element of *motion* inherent in Pop-Up Wackaroos (with the critter heads popping quickly up and down) means that Wackaroos involves "a more difficult challenge or *skill*" than the classic work bench (where the pegs to be struck are stationary). *See* Def.'s Brief at 27 (emphasis added). But, obviously, that "challenge or skill" is even greater when (as in Pop-Up Wackaroos) it is combined with the element of *time pressure* – an element that the Government consistently minimizes or ignores. *See* Def.'s Brief at 27 (discussing the "challenge or skill" inherent in the element of motion, with no reference to the element of time pressure).

is that the time pressure element represents a challenge, compounding the challenge of striking objects in motion – both of which must, in tandem, be overcome by a player's *skill* at quickly and accurately hitting the critter heads with the mallet.

Here, again, Customs simply got it wrong. Pop-Up Wackaroos plainly involves skill (and/or luck), and thus satisfies criterion (3) for tariff classification as a "game."

### d. "Rules Either Expressed or Self-Evident"

Over and above the standard four-criteria formula articulated by Customs and the Government and discussed above – *i.e.*, an article involving (1) a competition or contest with the objective of winning, (2) play activity between two or more people or between one person and the game itself, (3) skill, chance, or endurance, or a combination of these elements, and (4) a method or system of scoring – the Government here hints at various points in its papers that a "game" also must be "played according to rules either expressed or self-evident." *See*, *e.g.*, Def.'s Brief at 6; Def.'s Reply Brief at 1. *See also* Customs Headquarters Decision Memo at 2. However, the Government tends to discuss "rules" only in the context of one or another of its four specific criteria. *See*, *e.g.*, Def.'s Brief at 13 (referring to "a given set of rules" as a means of determining a "score" (*i.e.*, criterion 4) that measures a player's "skill or luck or combination thereof" (*i.e.*, criterion 3)), 14 (referring to "a given set of rules" against which "one's skill or luck" is measured using a "scoring system").

It is thus entirely unclear what role, if any, Customs and the Government believe "rules" play in determining whether an article is a "game" for tariff purposes. But, in any event, the matter is of

little moment in this case.  Although the Government asserts at one point that there is "no implied

or expressed rule that [someone playing Pop-Up Wackaroos] must hit all of the heads within any

specific time frame," and that "there is no real method of measuring one's skill or luck against any

given set of rules when playing" (*see* Def.'s Reply Brief at 7), those are overstatements, to say the

least.

Thus, while the Government claims that "Pop-Up Wackaroos has only one simple instruction

[or "rule"], to hit the heads," the Government also concedes – as it must – that "rules" need not be

in writing, and that they may be very "simple."  *See* Def.'s Brief at 16 & n.3.  It is, moreover, clear

– as detailed in section III.A.1.b, above – that, contrary to the Government's assertion, each

individual critter head not only must be *hit*, but must be hit *at the appropriate time* (*i.e.*, as it as it

randomly pops up, and before it disappears back into its hole) and *before the allotted time expires*.

Further, here – as with the miniature pinball machine in <u>Mego</u> – no instructions or rules for

play are really necessary, because both the objective of play and the operation of the merchandise

are relatively "obvious."  *See* <u>Mego</u>, 62 CCPA at 19.  In any case, Pop-Up Wackaroos are, in fact,

packaged with a sheet of simple written Instructions (or "rules") that state: "Turn [the base unit] on,

watch as [the cute critters] come out of their holes, then try to pop them back into place.  Players win

when all the critters have been pounded to stay down."  *See* Def.'s Exh. C (sample merchandise).

The bottom line is that, because Pop-Up Wackaroos is relatively simple, it has relatively

simple rules.  But rules, indeed, it has – both "expressed" and "self-evident."  Thus, to the extent that

tariff classification as a "game" requires such rules, Pop-Up Wackaroos satisfies that requirement.

Indeed, as detailed above, Pop-Up Wackaroos satisfies all of the valid established criteria for tariff classification as a "game." It involves (1) "a competition or contest with the objective of winning"; (2) "play activity" between a child and "the game itself"; and (3) skill (and/or luck). Pop-Up Wackaroos is thus *prima facie* classifiable as a "game" under heading 9504.

## 2. Heading 9503: The Definition of "Toy"

The determination that Pop-Up Wackaroos are *prima facie* classifiable under heading 9504 does not conclude the analysis. If merchandise is *prima facie* classifiable under two or more headings, GRI 3 applies. Here, the Government argues forcefully for Customs' classification of Pop-Up Wackaroos as "toys," under heading 9503. *See, e.g.*, Def.'s Brief at 22-28. If, indeed, the merchandise is *prima facie* classifiable under both headings 9503 and 9504, then resort must be had to GRI 3.

Heading 9503 of the HTSUS covers "[o]ther toys; reduced-size ('scale') models and similar recreational models, working or not; puzzles of all kinds; and accessories thereof." Defining "toy" as "an article *principally used* for [] amusement, diversion, or play," the Government reasons that heading 9503 is a "principal use" provision. *See* Def.'s Brief at 22 (emphasis added). As such, the Government asserts that heading 9503 is covered by Additional U.S. Rule of Interpretation ("ARI") 1(a). Def.'s Brief at 22-23.

ARI 1(a) addresses the classification of merchandise under a principal use provision, specifying that classification "is to be determined in accordance with the use in the United States . . . of goods of that class or kind to which the imported goods belong." ARI 1(a), HTSUS. Thus, the

Government argues, the classification of Pop-Up Wackaroos is controlled by the "use of the 'class or kind' of merchandise" to which Pop-Up Wackaroos belongs, explaining that goods are of the same "class or kind" if they are *commercially fungible* with one another.  Def.'s Brief at 23 (*quoting* Primal Lite, Inc. v. United States, 182 F.3d 1362 (Fed. Cir. 1999)).

The Government asserts that Pop-Up Wackaroos  is commercially fungible with "toys" "inasmuch as it moves in the same channels of trade as and [is] advertised, marketed and displayed with other toys."[21]  Def.'s Brief at 24-25.  To support that claim, the Government points to various wholesale catalogs produced by Fisher-Price.  The Government emphasizes that Pop-Up Wackaroos is not listed or featured with the merchandise designated as "games" in the tables of contents and indices of the catalogs, but rather with the merchandise designated as "preschool."  The Government's argument, in a nutshell, is that Fisher-Price itself "classif[ied]" Pop-Up Wackaroos alongside "toys" in its "advertising and marketing materials," and that Pop-Up Wackaroos therefore "moves in the same channels of trade as and [is] advertised, marketed and displayed with other toys." Def.'s Brief at 25-26.[22]

---

[21]The factors to be considered in determining whether merchandise falls within a particular "class or kind" include: (1) the general physical characteristics of the merchandise; (2) the channels of trade in which the merchandise moves; (3) the environment of the sale of the merchandise (*i.e.*, accompanying accessories and the manner in which the merchandise is advertised and displayed); (4) the use of the merchandise in the same manner as merchandise which defines the class; (5) economic practicality of so using the import; (6) the recognition in the trade of this use; and (7) the expectations of the ultimate purchaser. *See* Def.'s Brief at 24 (*citing* United States v. Carborundum Co., 63 CCPA 98, 536 F.2d 373 (1976) ).

[22]Only select pages of catalogs are included in the Government's exhibits.  It is thus impossible to fully assess the overall organization of the catalogs or to definitively determine whether there are other "games" featured alongside the "preschool" merchandise.  In any event, it is worth noting that, for example, in the 1994 catalog, Pop-Up Wackaroos is featured along with

The Government further contends that Pop-Up Wackaroos is "akin to the classic work bench hammer and pegs activity"of Fisher-Price's "Tap 'n Turn Bench," and is thus also a toy. Def.'s Brief at 26. The Government asserts, in essence, that the whacking involved in playing Pop-Up Wackaroos and the hammering used on the Tap 'n Turn Bench "require similar skills," and that Pop-Up Wackaroos is "merely a more sophisticated hammer and toy peg activity." *See* Def.'s Brief at 27-28. *But see* n.20, *supra* (distinguishing Pop-Up Wackaroos from the Tap 'n Turn Bench).[23]

In the end, it is unnecessary to reach the merits of the Government's arguments on this issue. For the reasons outlined below, even assuming that Pop-Up Wackaroos is, in fact, *prima facie* classifiable as a "toy," the merchandise is nevertheless ultimately classifiable as a "game machine" under heading 9504.

---

"Pop 'n Pinball," which the catalog describes as an "electronic pinball *game*." *See* Def.'s Exh. D (emphasis added). Similarly, the layout, graphics, and text arguably link Pop-Up Wackaroos and Pop 'n Pinball together, and contrast them with the other merchandise on the page. In short, it is not at all clear – from the few pages in the record – what the significance is of the organization of the catalogs.

Even more to the point, it is far from clear that the tables of contents, indices, and layouts of the catalogs reflect separate channels of trade, separate marketing, and separate displays. Indeed, the catalogs may be read to suggest just the opposite. Toys and games are marketed together, in one catalog, with whimsical and apparently fluid product categories like "Little People," "Super Toys," and "Great Adventures." *See* Def.'s Exh. D. Further, the catalogs themselves reveal little about channels of trade generally, and nothing about retail trade.

[23]The Government's logic on this point is somewhat less than transparent. It is not at all clear why similarities between hammering and whacking should have any bearing on whether Pop-Up Wackaroos is classifiable under heading 9503 as a "toy." Indeed, the whacking involved in playing Pop-Up Wackaroos is virtually identical to the whacking required to play the arcade game Whac-a-Mole. Yet the Government here concedes that the latter *is* a "game," while insisting that the former is not. *See* Def.'s Brief at 17.

B.  GRI 3: Goods *Prima Facie* Classifiable Under Two or More Headings

As discussed in section II.A.1 above, Pop-Up Wackaroos are *prima facie* classifiable as "game machines" under heading 9504.  But, if the merchandise is also *prima facie* classifiable as "toys" under heading 9503, then its classification is governed by GRI 3.  In any event, as Mattel observes, the application of GRI 3 results in classification as "game machines" under heading 9504. *See* Pls.' Brief at 11-13; Pls.' Reply Brief at 10-11.[24]

GRI 3(a) provides that "[t]he heading which provides the most specific description shall be preferred to headings providing a more general description."  Under this so-called "rule of relative specificity," merchandise is classified under the heading with the "requirements that are more difficult to satisfy and that describe the article with the greatest degree of accuracy and certainty." Orlando Food Corp. v. United States, 140 F.3d 1437, 1441 (Fed. Cir. 1998).  Here, there can be no doubt that heading 9504 (which covers "[a]rticles for arcade, table, or parlor games . . .") is more specific than heading 9503 (which refers broadly to "[o]ther toys . . .").  Classification under GRI 3(a) would thus lead conclusively to heading 9504.

Moreover, even were headings 9503 and 9504 to be deemed equally specific (such that GRI 3(a) could not control), classification under GRI 3(c) would lead to the same result.[25]  When merchandise cannot be classified pursuant to the other principles of GRI 3,  GRI 3(c) dictates that it is to be classified under "the heading which occurs *last in numerical order* among those which

---

[24]Because the Government staked its case in this matter entirely on GRI 1, its briefs here include no substantive GRI 3 analysis. *See* Def.'s Brief at 22 n.4; Def.'s Reply Brief at 9-10.

[25]GRI 3(b) concerns the classification of "[m]ixtures, composite goods . . ., and goods put up in sets for retail sale," and thus has no relevance here.

equally merit consideration."  (Emphasis added.)  Whatever else may remain unsettled in the field of customs law, this much is clear:   Heading 9503 precedes heading 9504.

In sum, all roads lead to the classification of Pop-Up Wackaroos as "game machines" under heading 9504.  To be sure, the merchandise is *prima facie* classifiable under that heading.  And even if it also *prima facie* classifiable as "toys" under heading 9503, heading 9503 is "trumped" by heading 9504 under both GRI 3(a) and GRI 3(c).

### C.  Customs' Classification Ruling and *Skidmore* Deference

As a final matter, the Government contends that Customs' interpretation of headings 9503 and 9504 in its ruling letter in this case should be accorded Skidmore deference.  *See* Def.'s Brief at 28-35; Def.'s Reply Brief at 10-13.  Customs' ruling letters are entitled to deference proportional to their persuasiveness.  United States v. Mead Corp., 533 U.S. 218, 235 (2001) (*citing* Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944)).  In evaluating the persuasiveness of a Customs classification ruling, factors to be considered include "the writers' thoroughness, logic, and expertness, [the ruling's] fit with prior interpretations, and any other sources of weight."  *Id.* at 235. Applying those factors to this case, Customs' classification ruling is entitled to no deference.

Customs' ruling letter was not adopted pursuant to a deliberative notice and comment rulemaking process.  While that fact is by no means determinative, it is nevertheless an important consideration in assessing the first Skidmore factor – the thoroughness of the ruling's reasoning.  *See* Structural Indus., Inc. v. United States, 356 F. 3d 1366, 1370 (Fed. Cir. 2004) (*citing* Rubies

Costume Co., v. United States, 337 F.3d 1350, 1356 (Fed. Cir. 2003)); Russ Berrie & Co., v. United States, 27 CIT ____, ____, 281 F. Supp. 2d 1351, 1353 (2003).

Customs fares even worse on the second Skidmore factor – the logic of its ruling.  As discussed at length above, the agency erred in determining that "a method or system of scoring" is an essential element of a game.  The agency premised its logic and reasoning on an incorrect reading of the relevant case law, a distortion (or an ignorance) of dictionary definitions, and a disregard for the common meaning of the tariff term "game." *Cf.*  Filmtec Co., v. United States, 27 CIT ___, ___, 293 F. Supp.  2d 1364, 1370 (2003) (according no deference where Customs relied on an incorrect reading of the Explanatory Notes and the tariff heading at issue).

The logic of Customs' ruling was also undermined by its reliance on previous rulings involving quite different merchandise.  Customs based its analysis of whether Pop-Up-Wackaroos is a "game" or a "toy" on previous classification rulings involving a set of plastic paddles and two air shuttlecocks (used in a tossing game), flying frisbee discs, and collectible paperboard drink tops (*see* Customs' Ruling Letter at 3 - 4) – articles that are very different from Pop-Up-Wackaroos (and, indeed, are not even machines).  Determining whether an article is a "game" or a "toy" is a very fact-intensive inquiry, turning largely on the specific characteristics of the article in question.  Thus, "prior rulings with respect to similar but non-identical items are . . . of little value in assessing the correctness of the classification of a similar but non-identical item." Structural Indus., Inc. v. United States, 356 F.3d 1366, 1371 (Fed. Cir. 2004).

The third Skidmore factor – the agency's body of expertise –  is the sole factor weighing in favor of deference here.  It is axiomatic that Customs has "specialized experience" in the

classification of goods.  Mead, 533 U.S. at 534 (quotations omitted).  However, that element weighs in favor of deference to every classification ruling.  Accordingly, it cannot be determinative.  Here, it is clearly outweighed by other considerations.

For reasons discussed in section III.A.1.a above, the fourth Skidmore factor – the ruling's consistency with prior interpretations – also counsels against deference in this case.  As that section explains, Customs has not treated a "method or system of scoring" as a "hard and fast" requirement for classification as a "game."  Indeed, as noted there, it is unclear what the agency means by a "system of scoring."

A final consideration weighing against deference in this case are the numerous factual errors that pockmark Customs' ruling.  For example, Customs erroneously described Pop-Up-Wackaroos as having five cavities with critter-heads.  (There are, in fact, six.)  Customs also stated that the "large red button in the bottom left corner of the unit turns the motor 'on' and 'off.'"  In fact, as the Instructions that accompany the merchandise clearly explain, the red button only turns the game "on."  In addition, Customs indicated that a player must hit all of the critter heads "in the correct order."  In fact, the order in which the heads are hit in no way affects the outcome of the game.

At first blush, some of those factual errors may seem relatively minor.  But it cannot be assumed that all are irrelevant to Customs' classification analysis – particularly since the question of whether Pop-Up-Wackaroos is a game turns on a detailed factual analysis of the product's features.  And, in any event, such errors belie any suggestion that the agency's determination reflects an in-depth familiarity with the merchandise.  Indeed, the errors in Customs' ruling here are particularly disconcerting because they did not appear in the Headquarters Decision Memo, which

predated this ruling. *Compare* Customs Headquarters Decision Memo *with* Customs' Ruling Letter. In any event, errors such as these undermine the credibility of the agency's decision-making.

Taking into consideration all of the above factors,  the balance tips decisively against Skidmore deference here.

### IV.  Conclusion

For all the reasons set forth above, Pop-Up Wackaroos is properly classified as a "game machine" under subheading 9504.90.40 of the HTSUS.  Mattel's motion for summary judgment is therefore granted, and the Government's cross-motion is denied.

Judgment will enter accordingly.

    /s/ Delissa A. Ridgway         
Judge

Decided: August 19, 2004
       New York, New York